UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


KIMBERLEY A WHITE,

      Plaintiff                            Civil Action No. 07-13489

v.

                                      District Judge Nancy G. Edmunds

                                      Magistrate Judge R. Steven Whalen


MICHAEL J. ASTRUE,

COMMISSIONER OF SOCIAL

SECURITY,

      Defendant.

_____/


## REPORT AND RECOMMENDATION

      Plaintiff Kimberley A. White brings this action under 42 U.S.C. §405(g) challenging

a final decision of Defendant Commissioner denying her application for Disability Insurance

Benefits under the Social Security Act.   Plaintiff has filed a motion summary judgment or

remand [Docket #10] and Defendant has filed a motion for summary judgment [Docket #14]

which have been referred for a Report and Recommendation pursuant to 28 U.S.C.

§636(b)(1)(B).   For the reasons set forth below, I recommend that Defendant's motion be

GRANTED and Plaintiff's motion DENIED.

## PROCEDURAL HISTORY

On June 30, 2003, Plaintiff applied for Disability Insurance Benefits ("DIB"), alleging an onset date of December 15, 1999 (Tr. 55). After the initial denial of benefits, she requested an administrative hearing, held before Administrative Law Judge ("ALJ") Ethel Revels in Detroit, Michigan on February 1, 2005 (Tr. 523). Plaintiff, represented by counsel, testified as did Vocational Expert ("VE") James Fuller (Tr. 525-546, 546-552). On April 26, 2005, ALJ Revels determined that Plaintiff was disabled for the closed period of November 4, 2002 to July 22, 2004, but from December 15, 1999 to November 4, 2002 and July 22, 2004 through April 26, 2005, was capable of a limited range of unskilled light work (Tr. 25-27). On May 25, 2007 the Appeals Council denied review (Tr. 6). Plaintiff filed for judicial review on August 20, 2007.

## BACKGROUND FACTS

Plaintiff, born October 13, 1975 was 29 when ALJ Revels issued her decision (Tr. 55). She completed 11th grade and received training as a medical assistant (Tr. 76). She worked formerly as a production worker, sales clerk, receptionist, warehouse worker, and stock clerk (Tr. 122). She alleges disability as a result of a bipolar disorder and severe depression (Tr. 70).

### A.    Plaintiff's Testimony

Plaintiff testified that she completed the equivalent of only 10th grade, but later received a GED (Tr. 526). She reported that her most recent job lasting more than three

months involved both shipping and receptionist duties, adding that the position required her to lift up to 50 pounds occasionally, 20 pounds frequently, and walk or stand on a constant basis (Tr. 527). She stated that she had last worked in 2000, but held the position (working in a pharmacy) for only two weeks (Tr. 528). She stated that prior to the pharmacy job, she had worked at Target stocking shelves and cashiering for a total of two months (Tr. 528-529). Plaintiff attributed her inability to work more than a few weeks at a time to anxiety, sleeplessness, and depression (Tr. 529). She added that before her work as a stock clerk, she worked briefly as a receptionist and a sales clerk (Tr. 529-530). Plaintiff stated that "better hours" motivated her to quit the shipping position and work at Target, but stated that she was discharged from Target after exhibiting symptoms of anxiety and depression (Tr. 534). She testified that during her stint as a warehouse worker she missed work because of depression, but admitted that at the time she quit, she was still capable of gainful employment (Tr. 544-545).

Plaintiff reported that she first sought mental health treatment in the summer of 2000 (Tr. 535). She testified that initially, a psychiatrist diagnosed her with a compulsive disorder, but that she was re-diagnosed after prescribed medication failed to improve her condition (Tr. 536). She stated that later, her "regular doctor," Dr. Margolis, prescribed Paxil as well as the medications originally prescribed by her psychiatrist (Tr. 536). She indicated that in 2002, she began psychiatric treatment at the Eastwood Treatment Clinic (Tr. 536-537).

Plaintiff testified that her condition was marked by lethargy, racing thoughts, anxiety,

agitation, and the inability to focus (Tr. 537). She alleged that her condition had worsened since 2000 due to medication changes, indicating that her "bad" days outnumbered the "good" ones (Tr. 538). She admitted that on her good days, she was able to function, but expressed doubt that she could both work and take care of her school-age daughter (Tr. 540).

Plaintiff testified that despite the fact that she took her medication as prescribed, she frequently experienced sleeplessness (Tr. 541). She noted that Cerapro eased symptoms of paranoia and that Propanol helped her control the "jitters" (Tr. 542). She reported that in addition to her mental conditions, she experienced endometriosis which required yearly surgery (Tr. 544).

### B. Medical Records

### 1. Treating Sources

In January, 1985, Plaintiff, then in third grade, was referred for evaluation as a result of "academic delays" (Tr. 123). The evaluation found the presence of "[p]ossible attention and organization difficulties" and "questionable work habits" contributing to reading and writing deficiencies (Tr. 127). Plaintiff received verbal, performance, and full scale IQ scores of 106 (Tr. 129). In May, 1985, Plaintiff was assigned a teaching consultant (Tr. 133). In May, 1988, a report noted that Plaintiff continued to "hurry through her work causing careless errors," but concluded that she no longer required the use of a teaching consultant (Tr. 147-148).

In August, 1999, Plaintiff, having given birth 10 months earlier, reported pelvic pain

(Tr. 199). Edward Merkel, M.D. noted that Plaintiff had "a strong family history of endometriosis" (Tr. 199). Plaintiff underwent a laparoscopy in October, 1999 (Tr. 203). In February, 2000, Plaintiff sought emergency treatment for a "minimally displaced fracture" of the left hand after her boyfriend threw a bottle at her (Tr. 292, 294).

In March, 2000, treating notes state that Plaintiff experienced depression as a result of partner abuse (Tr. 207). She was prescibed Zoloft (Tr. 207). The same month, Plaintiff underwent a diagnostic hysteroscopy without complications (Tr. 209, 300). Treating notes from May, 2000 indicate that although her boyfriend had made advances in controlling his temper and substance abuse, Plaintiff was "doubtful of a reconciliation" (Tr. 212). The same month, a medication review indicates that she was assigned a GAF of 40-50 and was prescribed Prozac[1] (Tr. 324).

In November, 2000, Plaintiff reported that pain from endometriosis was "not so severe so as to require Darvocet" (Tr. 217). In January, 2001 she was prescribed Darvocet for severe pelvic cramps (Tr. 218). In April, 2001 Dr. Merkel, noting that a three-month trial of Depo-Lupron for endometriosis had caused hot flashes, bone pain, depression, and weight gain, advised against its continued use (Tr. 223). Plaintiff underwent a laparoscopic procedure for endometriosis without complications (Tr. 226-227, 303). Treating notes from the same month show that Plaintiff was prescribed Paxil (Tr. 225). In June, 2001, Plaintiff

[1]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 (*DSM-IV-TR* ) (4th ed.2000).

reported a 30 percent improvement as a result of the procedure (Tr. 229). In August, 2001, Plaintiff complained of knee pain, gastroesophageal reflux, and an anxiety disorder (Tr. 349). She was advised to follow up with psychiatry for a possible medication change (Tr. 349). In November, 2001, Plaintiff complained to Michael S. Schaeffer, M.D. that Effexor made her nauseated (Tr. 355). Dr. Schaeffer advised restarting Paxil (Tr. 355).

Also in November, 2001, a psychosocial assessment performed by Hegira Programs, Inc. found that Plaintiff's intellectual functioning and memory were normal, but that she experienced sleep interuptions, chest pains, binge eating, weight gain, and a change in sexual interest (Tr. 408). The same assessment found that Plaintiff lacked "motivation to learn about change," but nonetheless planned to obtain vocational training and did not experience a limitation in daily activities as a result of psychological problems (Tr. 411-412). The assessment also found the absence of suicidal or homicidal ideation (Tr. 413). Plaintiff was neatly dressed and verbal with a full range of emotions (Tr. 416). Plaintiff reported stress, sleeping problems, mood swings, weight gain, confused thinking, and poor self esteem (Tr. 419). Plaintiff's therapist reported "little progress" the following month, noting that she was tearful, depressed, and anxious (Tr. 423). The same month, she was assigned a GAF of 45-50 (Tr. 430). Plaintiff was discharged from Hegira on December 22, 2002 after withdrawing "without therapist contact" (Tr. 433). Discharge notes state that she "[c]ontinued to blame others for her problems," but reported a decrease in depression (Tr. 435).

In February, 2002, Plaintiff was prescribed Skelaxin and Vioxx for "mid low" back pain (Tr. 360). The next month, Dr. Schaeffer prescribed physical therapy for Plaintiff's

complaints of severe left knee pain (Tr. 363). In May, 2002, David Margolis, M.D. opined that Plaintiff's depression was moderately controlled (Tr. 371). The following month, she reported asthma and allergies (Tr. 379). In October, 2002, Dr. Margolis ordered imaging studies for reports of migraine headaches (Tr. 388). MRI studies from the same month showed normal results (Tr. 390). In November, 2002, an intake assessment form by Eastwood Clinics indicates that Plaintiff reported depression since adolescence (Tr. 441). She demonstrated good short-term and long-term memory and average intelligence (Tr. 441). She reported reconciling with her boyfriend (Tr. 442). In December, 2002, Plaintiff again reported severe pelvic pain, undergoing a laparoscopy in January, 2003 (Tr. 232, 238, 317). The same month, Plaintiff told her therapist that she was "doing fairly well" (Tr. 447).

A February, 2003 medical review states that Plaintiff experienced "improved mood stability" (Tr. 325). The same month, she was prescribed Bextra and Robaxin for low back pain (Tr. 406). April, 2003 therapy notes state that Plaintiff appeared "cheerful" and "more energetic," at one session, but "feeling down" at the next (Tr. 448-449). Therapy notes from the next month state that Plaintiff was "very depressed" and "extremely emotional" (Tr. 450). Treating notes from July, 2003 indicate that Plaintiff obtained relief from steroid injections for heel pain as a result of Plantar fasciitis (Tr. 260). In August, 2003, Plaintiff was diagnosed with "a small hiatal hernia" (Tr. 262-263). In August, 2003, Plaintiff's therapist recommended a transfer to a counselor "who takes Medicare" (Tr. 451).

In March, 2004, therapy notes, characterizing Plaintiff's status as "psychomotor retardation," state that Plaintiff was "not doing well" as a result of pressure from her daughter

to get married "so she can have a father" (Tr. 456).   In May, 2004, Plaintiff indicated that she felt ready to start a new relationship (Tr. 457).  The same month, Plaintiff reported that she felt "overwhelmed" as a result of flooding in her basement (Tr. 458).  A medications review showed that Plaintiff's condition was either stable or improving with a GAF of 45-55[2] (Tr. 331-332).  July, 2004 treating notes indicate that Plaintiff experienced a greater degree of stability (Tr. 459).  The following month, Plaintiff's status was listed as "overwhelmed," but notes indicate that "she was doing better," after flooding problems subsided (Tr. 460).

In July, 2004, Preeti Venkataraman, M.D. completed an assessment of Plaintiff's work-related aptitudes, finding that her ability to relate to co-workers, deal with the public, use judgment, and interact with supervisors was "fair," with a "poor" ability to deal with work stresses, function independently, maintain attention and concentration, or deal with changes in a routine work setting (Tr. 497).  Plaintiff's ability to carry out complex or detailed job instructions was deemed "poor," with a "fair" ability to carry out simple instructions or make "personal-social" adjustments (Tr. 498).  An accompanying but undated "Affective Disorders Assessment" states that Plaintiff's bipolar and affective disorders were characterized by "loss of interest in almost all activities;" sleep disruptions; "psychomotor agitation or retardation;" decreased energy; guilt; concentrational problems; suicide ideation,

---

[2]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

"hallucinations, delusions, or paranoid thinking;" hyperactivity; and easy distractibility (Tr. 499). Plaintiff's limitations in daily living and social functioning were deemed "marked," with "extreme" concentrational limitations (Tr. 500). A medication review performed the same month indicate that Plaintiff was improving despite a GAF of 45 (Tr. 330, 502). Therapy notes from August 4, 2004 indicate that Plaintiff was "doing better" with "signs of assertiveness" and independence (Tr. 503). Assigning Plaintiff a status of "underfunctioning," her counselor made the following notes:

> "Client claims that anything beyond what she has to do is [too] much for her. Counselor confronted client thinking normalizing fatigue when doing undesirable tasks. Client protective of her position"

(Tr. 503). A September, 2004 medication review assigned Plaintiff a GAF of 50, but noted that her clinical status was deteriorating (Tr. 504). Therapy notes from October, 2004 state that Plaintiff felt "unmotivated to get out of bed except to care for her child and animals" (Tr. 505). Later the same month, treating notes show that she continued "to assert herself about disability claim and is making progress" (Tr. 505). December, 2004, notes indicate that Plaintiff was "doing well, and was "setting improved boundaries" with her daughter (Tr. 508).

## 2. Consultive and Non-examining Sources

In October, 2003, psychiatrist Basivi Baddigam, M.D. performed a consultive examination of Plaintiff on behalf of the SSA (Tr. 462-466). Plaintiff reported severe depression and anxiety as well as episodes of mania (Tr. 462). Plaintiff denied suicide or physical aggression, but reported mood swings (Tr. 462). Dr. Baddigam noted that Plaintiff

had never been hospitalized, but had been treating with a psychiatrist and therapist for the past 10 months and currently took Trileptal, Wellbutrin, Prozac, and Seroquel without side effects (Tr. 462). Plaintiff, divorced with one child, reported that she lived with her mother and daughter (Tr. 463). Appearing "cooperative and friendly" she acknowledged that she continued to cook, go to church occasionally, and perform household chores (Tr. 463). Finding that Plaintiff's prognosis was "guarded" as a result of a bipolar disorder, the physician assigned her a GAF of 50 (Tr. 465).

On November 5, 2003, a Physical Residual Functional Capacity Assessment performed on behalf of the SSA found that Plaintiff could lift 20 pounds occasionally; 10 pounds frequently; walk, stand, or sit for about six hours in an eight-hour workday; and perform unlimited pushing or pulling (Tr. 470). The Assessment found further that Plaintiff was limited to frequent (as opposed to constant) climbing, balancing, kneeling, crouching, and crawling; and the ability to stoop on an occasional basis (Tr. 471). The Assessment found the absence of manipulative, visual, communicative, or environmental limitations, concluding that because Plaintiff continued to perform a wide range of activities, her allegations of limitation were only "partially credible" (Tr. 474).

DDS consultation notes dated November 6, 2003 indicate that despite experiencing depression, Plaintiff appeared neat, clean, was easy to interview, and displayed good eye contact (Tr. 477). Also in November, 2003, H.C. Tien, M.D. performed a Psychiatric Review Technique of Plaintiff's treating records, finding the presence of an affective disorder (depression) (Tr. 479, 482). Under the "B" criteria of listings, Dr. Tien found that

Plaintiff experienced moderate difficulties "maintaining concentration, persistence, or pace" but otherwise mild limitations (Tr. 489). The same month, Dr. Tien completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff's ability to carry out detailed instructions; maintain attention and concentration for extended periods; and set realistic goals or make plans independently of others was moderately limited (Tr. 493-494). Noting that Plaintiff's cognitive, social, and adaptive abilities were not significantly limited, Dr. Tien concluded that Plaintiff was capable of a "wide range of simple, unskilled tasks[] in a regular work environment" (Tr. 495). However, he allowed for the possibility that Plaintiff's work capacities could be additionally limited by physical impairments (Tr. 495).

## C.    VE Testimony

VE James Fuller classified Plaintiff's past relevant work as a production worker as unskilled at the light exertional level; sales clerk, unskilled and light; receptionist, semi-skilled and sedentary; and warehouse worker, unskilled and medium[3] (Tr. 547). He found that the receptionist position was transferable to data entry work (Tr. 549). The ALJ posed the following hypothetical question, taking into account Plaintiff's age, educational level, and work experience:

---

[3] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

"Assume . . . that our hypothetical Claimant needs work that is in a relatively clean setting, she needs a low stress environmental and I am defining low stress as one where there is no requirement to work with the general public, nor in close contact with co-workers. Our hypothetical Claimant also needs simple repetitive type work or because of a moderate limitation in their ability to maintain attention and concentration due to mental impairment. There is moderate limitation in their ability to understand and then to carry out detailed instruction due to a mental impairment. If you assume that, what jobs would our hypothetical Claimant be vocationally qualified to perform?"

(Tr. 549-550).

VE testified that given the above limitations, the individual could perform "a limited number" of light, unskilled assembling, packaging, and inspection jobs, finding that 2,000 of each position existed in the regional economy (Tr. 550). He found that approximately 500 additional positions existed for each job listing at the sedentary exertional level and an addition 500 at the medium level, adding that he limited his findings to unskilled work based on the hypothetical's limitation of "simple repetitive work" (Tr. 550-551). The VE found that if the hypothetical individual had "poor or no ability to deal with work stresses, maintain attention and concentration, and function independently," all gainful employment would be precluded (Tr. 552). He stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT").

### D. The ALJ's Decision

ALJ Revel found that although Plaintiff's conditions of patellofemoral syndrome, bipolar disorder, depression, allergies/asthma, hiatal hernia, endometriosis, and hypothyroidism were severe impairments based on the Regulations in 20 C.F.R. § 404.1520(c), none of the conditions met or medically equaled one of the listed impairments

in Appendix 1, Subpart P, Regulation 4 (Tr. 20).

The ALJ determined that although Plaintiff was unable to perform her past relevant work, she retained the following residual functional capacity ("RFC") from December 15, 1999 to November 4, 2002 and July 22, 2004 through April 26, 2005:

> "light exertional work in a relatively clean environment in a low stress setting. Low stress setting means no work with the general public or in close contact with co-workers. The work must be unskilled to allow for moderate limitations in an ability to maintain concentration for extended periods and to carry out detailed instructions due to pain and depression"

(Tr. 26).

However, the ALJ found that Plaintiff was disabled from November 4, 2002 through July 21, 2004, noting that during this period, Plaintiff experienced "marked restrictions" (Tr. 24, 27). The ALJ found that before and after the closed period of disability, Plaintiff was capable of a limited range of light work, including the jobs of assembler, packager, and visual inspector (Tr. 25, 27).

The ALJ found Plaintiff's allegations of ongoing disability "not fully credible," finding that despite the presence of a mental impairment, "the medical record only shows that it was severe for closed period of time before it responded well to psychotropic medications and therapy" (Tr. 25, 26). Noting the November, 2003 Mental Residual Functional Capacity Assessment finding that Plaintiff could perform "simple, unskilled work," the ALJ determined nonetheless that treating records supported her finding of a closed period of disability (Tr. 25).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,

whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff argues first that the ALJ impermissibly rejected Dr. Venkataraman's finding of disability-level limitations. *Plaintiff's Brief* at 9-19, *Docket #10.* She argues further that the ALJ's finding of non-disability as of July 22, 2004 is based on a misreading of the treating physician's findings from the same month. Next, she contends that the ALJ's credibility determination is tainted by the failure to consider the factors set forth in SSR 96-7p and 20 C.F.R. §404.1527(d)(2)[4]. *Id.* at 19-21. Finally, she argues that the hypothetical question did not account for her full degree of limitation, thus invalidating the Step Five non-disability

---

[4]

If a treating physician's opinion is accorded less than controlling weight, the ALJ must consider "the length of the treatment relationship . . . the frequency of examination, the nature and extent of the treatment relationship, [the] supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004);20 C.F.R. §404.1527(d)(2). "ALJ must 'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Id.*; 20 C.F.R. §404.1527(d)(2).

finding. *Id.* at 22-25.

## A. The Treating Physician Analysis

Plaintiff makes two separate arguments for remand based on the ALJ's treating physician analysis. First, Plaintiff contests the ALJ's rejection of Dr. Venkataraman's July, 2004 finding of ongoing marked work-related limitations, in particular taking issue with the ALJ's statement that "[t]he doctor failed to provide medical documentation to support his conclusions" (Tr. 24). However, pursuant to 20 C.F.R. §404.1527(d)(2), because the treating physician's finding of extreme limitation stood at odds with therapy notes as well as other portions of the record, the ALJ was entitled reject it. Although Plaintiff contends that the treating physician properly relied on her treating records in making his findings, in fact, these same records easily support the opposite conclusion. A medications review of May, 2004 indicates that Plaintiff was responding well to medication (Tr. 331-332). The same month, Plaintiff told her therapist that she felt stable enough to pursue a relationship (Tr. 457). Although Plaintiff also claims that the ALJ mis-diagnosed her mental conditions by referring to them as "situational," the ALJ, rather than making her own diagnosis, reasonably noted that Plaintiff's psychological problems were exacerbated by interpersonal conflicts and housing problems (Tr. 23). Likewise, the ALJ's finding that Plaintiff's condition improved in July, 2004 after she resolved housing problems is supported by substantial evidence in the form of treating notes which suggest that she was capable of a greater degree of functioning than alleged (Tr. 459, 460, 503).

Second, Plaintiff's argues that although the ALJ concurred in part with the treating

physician's opinion by finding that she experienced "moderate to marked" concentrational limitations from November 4, 2002 through July 21, 2004, her additional finding that Plaintiff was not disabled as of July 22, 2004 relies on a misinterpretation of the record. *Plaintiff's Brief* at 12. Again, the administrative finding neither misinterpreted nor distorted the record. Although Plaintiff's disputes the ALJ's inference that she was unmotivated, rather than unable to work, treating records created in September, 2004 indicate that Plaintiff "normaliz[ed] fatigue when doing undesirable tasks" (Tr. 503). Likewise, notes from the next month stating that Plaintiff was "*unmotivated* to get out of bed except to care for her child and animals" (emphasis added) imply that Plaintiff was capable, but unwilling, to improve her functioning level.[5]

### B. Credibility

Plaintiff submits next that the ALJ's credibility determination stands unsupported by

---

[5]

Plaintiff also contends that the ALJ failed to assess her mental functional limitations for the period before November 4, 2002. *Plaintiff's Brief* at 9-10. However, the administrative decision contains the finding that "[p]rior to November 4, 2002 . . . . [h]er mental disorder did not impose any restriction on her daily living activities and social functioning," finding further that Plaintiff's concentrational abilities were moderately limited and "no evidence of repeated episodes of decompensation" (Tr. 23).

Plaintiff also argues although the ALJ found that *after* July 21, 2004 she experienced moderate restrictions in "social functioning and attention and concentration," she erred in failing to assess either Plaintiff's daily living limitations or whether she experienced episodes of decompensation. However, ALJ's narrative of the pre-disability, disability, and post-disability periods at transcript pages 23and 24 indicate that her original finding of an absence of daily living limitations or episodes of decompensation (which were not part of the basis for a closed period of benefits) remained unchanged from the alleged onset date through the date of the decision.

substantial evidence, again arguing that records prior to November 4, 2002 and after July 21, 2004 establish ongoing disability. *Plaintiff's Brief* at 19-22. She also contends that the ALJ failed to consider the factors set forth in SSR 96-7p and C.F.R. 404.1529(c)(3) for making a credibility assessment.[6] *Plaintiff's Brief* at 20.

First, as discussed above, treating records created in July, 2004 forward easily support the ALJ's determination. Further, as noted by the ALJ, a November, 2003 non-examining assessment found that Plaintiff was capable of "simple, unskilled tasks," supporting the finding that at most, Plaintiff was disabled for a closed period only (Tr. 495). Mental treatment discharge notes dated December, 2002 also stand at odds with Plaintiff's allegation of ongoing disability (Tr. 435). The latitude generally ceded to an ALJ's credibility determination is appropriate here. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *see also Richardson, supra,* 402 U.S. at 401. An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record.'" *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989); *Imani v. Heckler,* 797 F.2d 508, 512

---

[6]C.F.R. 404.1529(c)(3) lists the factors to be considered in evaluating whether a claimant experiences disabling pain:
  (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

(7th Cir.1986).

Plaintiff's secondary argument that the ALJ did not consider the §404.1529(c)(3) factors is belied by the fact that the ALJ cited these factors, verbatim in her decision (Tr. 24-25). Plaintiff also argues that the credibility determination, like the treating physician analysis, is invalidated by the ALJ's misreading of her treating records. However, as discussed in Section **A.**, the ALJ's reasonable interpretation of source material supporting her treating physician analysis also supports the conclusion that Plaintiff was not fully credible. The ALJ's credibility determination, both substantively and procedurally adequate, does not provide a basis for remand.

### C. The Hypothetical Question

Finally, Plaintiff contends that the hypothetical question did not reflect her true degree of limitation. Re-citing the same records used in her "treating physician" argument, she submits that the hypothetical question's exclusion of Dr. Venkataraman's July, 2004 finding of *marked* work-related limitations invalidates VE's job findings. She also argues that even assuming that the ALJ's finding of *moderate* (rather than marked limitations) is accurate, the hypothetical question limitations of "simple repetitive type work" were insufficient to account for moderate concentrational deficiencies. *Plaintiff's Brief* at 23; *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005)(Friedman, J.).

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays plaintiff's individual physical and mental impairments." *Varley v. Secretary of*

*Health & Human Services,* 820 F.2d 777, 779 (6th Cir. 1987)(internal citations omitted). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994); *Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

First, as stated above, substantial evidence supports the ALJ's finding that Plaintiff did not experience marked limitations either before November 4, 2002 or after July 21, 2004; the ALJ was therefore not obliged to include marked limitations in her hypothetical question. I also disagree that ALJ Revel's hypothetical question failed to account for moderate Plaintiff's concentrational deficiencies. This argument is a novel, but unpersuasive twist on the familiar premise that hypothetical limitations such as "simple," and "routine," may fail to account for "moderate" concentrational deficiencies. *Benton v. Commissioner of Social Sec.* 511 F.Supp.2d 842, 849 (E.D.Mich.,2007)(Roberts, J.); *Edwards, supra,* 383 F.Supp.2d at 931; *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir. 1996); *McGuire v. Apfel,* 1999 WL 426035, 15 (D. Or. 1999). *See Roe v. Chater,* 92 F.3d 672, 676-77 (8th Cir. 1996).

In contrast to the above cases in which the hypothetical question did not fully account for moderate concentrational limitations, here, the moderate limitations were actually incorporated into hypothetical question verbatim for consideration by the VE:

> "Our hypothetical Claimant also needs simple repetitive type work or because of a moderate limitation in their ability to maintain attention and concentration due to mental impairment. There is moderate limitation in the ability to understand and then to carry out detailed instruction due to a mental impairment"

(Tr. 549-550). The ALJ's inclusion of Plaintiff's moderate limitations thus ensured that the VE's job findings accurately reflected Plaintiff's full degree of limitation as a result of these deficiencies.

In closing, I note that the non-disability finding is not intended to trivialize Plaintiff's legitimate impairments as a result of depression and a bipolar disorder. However, based on a review of this record as a whole, the ALJ's decision that Plaintiff's disability was limited to a closed period is well within the "zone of choice" accorded to the fact-finder at the administrative  level and should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend  that Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment GRANTED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 20, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 20, 2008.


s/Susan Jefferson
Case Manager